# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RONALD E. SEYMORE,<br><br>PLAINTIFF,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of the<br>Social Security Administration,<br><br>DEFENDANT. | )<br>)<br>)<br>)<br>)  CASE NO. 10-CV-167-FHM<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OPINION AND ORDER

Plaintiff, Ronald E. Seymore, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits. In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir. 2003). The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial

evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was 37 years old at the time of the alleged onset of disability [R. 47, 240, 247] and was 43 years old when the second hearing was conducted [R. 576]. He claims to have been unable to work since January 30, 2003, due to: dizziness or lightheadedness; eyesight problems caused by blindness in the left eye and inability to focus or tolerate light and frequent infections of the right eye; back pain; hypertension; diabetes; depression; anger; anxiety and post-traumatic stress disorder. [Plaintiff's Briefs Dkts. 15, 17]. The ALJ determined that Plaintiff has severe impairments consisting of loss of vision in the left eye, diabetes and high blood pressure controlled on medicine with occasional dizziness [R. 401], but that his residual functional capacity (RFC) allows him to perform his past relevant work as a telemarketer. [R. 402-404]. The ALJ concluded, therefore, that Plaintiff is not disabled as defined by the Social Security Act. [R. 404-405]. The case was thus decided at step four of the five-step evaluative sequence for determining whether a claimant is disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five steps); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

Plaintiff asserts the following allegations of error: 1) the ALJ failed to perform a proper determination at step 4 of the sequential evaluation process; 2) the ALJ failed to perform a proper evaluation of the medical source opinion; and 3) the ALJ failed to perform a proper credibility determination. [Dkt. 15, p. 2]. For the reasons discussed below, the Court affirms the decision of the Commissioner.

## Medical Treatment and Procedural History

Records from the Tulsa Eye Institute, dated July 11, 2001, indicate Plaintiff had complaints of red, burning and decreased vision in the right eye and was having trouble reading. [R. 124-128]. He had lost his left eye in 1989 and had a prosthesis. *Id.* He was diagnosed with acute conjunctivitis and given samples of medication and moisturizer. *Id.* On January 15, 2003, Plaintiff's eye exam was normal. [R. 128]. His vision for distance was assessed at 20/40 without glasses, 20/20 with glasses and for near vision at 20/25 without glasses, 20/20 with glasses. *Id.*

A physical RFC assessment dated January 29, 2003, apparently generated during a previous social security disability claim filed by Plaintiff [R. 47], indicated a visual limitation of depth perception but identified no other visual limitations or exertional, postural, manipulative, communicative or environmental limitations. [R. 131-137].

As shown in the treatment records from OU Physicians - Tulsa Family Medicine (OU), Plaintiff has been undergoing treatment for hypertension (high blood pressure) since at least September 2002. [R. 166]. In April 2004, Plaintiff demonstrated no appearance of anxiety, depression or agitation. [R. 273]. The first complaint of anxiety appears in the OU records on August 27, 2004, when Plaintiff was assessed to be moderately anxious and was given a "starter pack" of Zoloft[1] to try for three weeks. [R.

---

[1] Zoloft (Sertraline) is a selective serotonin, used in treatment for depression. *PDR*, 53rd ed. (1999) 2443.

157-159]. Sometime after that he was prescribed Buspar[2] which he reported on September 28, 2004 "well controlled" his anxiety. [R. 155-156, 269].

Plaintiff filed applications for Social Security benefits on October 5, 2004, alleging a disability onset date of January 30, 2003. [R. 47, 240, 247].

Plaintiff was examined by G. Bryant Boyd, M.D., on behalf of the agency on December 28, 2004. [R. 138-143]. Dr. Boyd reported Plaintiff's history, including complaints of eye and back problems, his current work as a telemarketer, his statement that he had fourteen children and was paying child support on four of them which "keeps him strapped for finances." [R. 138]. Physical examination revealed a thin, healthy appearing black male with a patch over his left eye, who moved about the exam room and on the exam table unassisted. Results of the musculoskeletal exam showed grip strong and equal bilaterally, normal gait, negative straight leg raising and no evidence of muscle atrophy or asymmetry. [R. 140]. Plaintiff claimed tenderness with palpation over the upper sacral area and when asked to forward flex the lumbar spine. *Id.* No spasm or swelling was noted. *Id.* During the neurological examination, Plaintiff was oriented to time, person and place; his speech was normal, as were his reflexes and cranial nerves. [R. 139]. He was able to use his hands for gross and fine manipulation, plantar reflexes were down-going and his sensory exam was normal. *Id.* Dr. Boyd's impression was: 1. Low back pain; 2. Prosthetic left eye; 3. History of hypertension; 4. History of anxiety/depression; 5. Complaint of intermittent stinging of

---

[2] Buspar (Buspirone) is used in the short-term treatment of symptoms of anxiety. *See drug information online at:* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688005.html (last reviewed - 09/01/2008).

the right eye with normal eye exam; and 6. Otherwise normal physical examination. [R. 139].

On January 31, 2005, the Social Security Administration's psychologist prepared a PRT.[3] The Listing under which Plaintiff was rated was 12.06, Anxiety-Related Disorders. [R. 169-182]. The degree of functional limitation in restriction of activities of daily living, difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace all were rated as: "Mild." [R. 179]. Plaintiff was found to have no repeated episodes of decompensation. *Id.* The agency consultant thus found Plaintiff's mental impairment to be non-severe. *Id.* By way of explanation for this finding, the consultant acknowledged Plaintiff's allegations of back pain and vision problems but noted that the records indicate Plaintiff "has a problem with anxiety and depression also. A call to clt indicates he has never been inpatient for mental reasons. He has never seen a psych before but was scheduled to see one and missed the appt. He was not rescheduled." [R. 181]. The psychologist also noted Plaintiff's prescription of Buspar by his treating physician and the clinic note that his anxiety was well controlled on that medication. *Id.* Plaintiff's current work as a telemarketer below SGA (substantial gainful employment) and activities of daily living that did not reference

---

[3] Under the regulations, when evaluating mental impairments, the agency must follow a "special technique." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). The agency is required to rate the degree of a claimant's functional limitations caused by those impairments in the areas of "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The pertinent findings and conclusions required in the application of the technique are used to complete a PRT form. The ALJ applies the ratings in determining whether the claimant's mental impairments are severe at step two and, if so, whether these severe impairments "meet[ ] or [are] equivalent in severity to a listed mental disorder" at step three. Id. §§ 404.1520a(d)(1-2), 416.920a(d)(1-2). At the ALJ hearing level, "[t]he decision must include a specific finding as to the degree of limitation in each of [those] functional areas." Id. §§ 404.1520a(e)(2), 416.920a(e)(2).

memory problems, anxiety or depression and his other activities were also noted in the explanation for the PRT findings. *Id.*

A physical RFC assessment was prepared by an agency consultant on February 1, 2005. [R. 183-189]. Plaintiff's exertional abilities were assessed as: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday and unlimited push and/or pull. [R. 184]. The explanation given was:

> The clt is a 38 y/o male who alleges back pain and an artificial left eye. At 12/28/04 Intern exam the clt had a BP of 142/90 ht 69" and wt 157 lbs. He had a prosthetic left eye and uncorrected vision in the right eye of 20/70. Tenderness at sacral area with palpation. No spasm or swelling noted. Pain with forward flexion of the lumbar spine. ROM with back flexion 80 degrees. All other ROM at back and extremities normal. Normal gait.

*Id.*

On March 14, 2005, Plaintiff was seen at OU Family Medicine Clinic (OU) for hypertension and anxiety/depression. [R. 148-152]. He denied lightheadedness, double vision, eye irritation or vision loss but requested medication for anxiety, reporting that he got irritable easily and he wanted something different than the Buspar and Zoloft he had been prescribed in the past. *Id.* He was referred for psychological therapy, was prescribed Celexa[4] and was also referred to a social worker due to financial stress. *Id.* Plaintiff was seen at OU in July 2005 for stomach upset and in August 2005 for

---

[4] Celexa is indicated for the treatment of depression. *See* Physicians' Desk Reference (PDR), 62nd ed. (2008) 1161-1162.

6

problems with anger after reporting he had been in a fight that week. [R. 301-308]. He was counseled "to avoid conflict at all costs." [R. 303].

Plaintiff was next seen at OU on January 13, 2006 for follow up. [R. 290]. He was "still not taking meds for high lipids due to cost" and he had "not yet seen social worker for med and health cost assistance." *Id.* He reported he was still having trouble with losing his temper and had "not heard about appointment referral" with a psychological counselor. *Id.*

The record contains a treatment plan commenced on January 30, 2006, at Family and Children's Services (F&CS) for individual, anger management group and gang task force counseling. [R. 216-226]. The case contact log for the time period between January 30, 2006 and June 5, 2006 shows four one hour counseling sessions and ten cancellations or no shows for scheduled appointments. [R. 212, 358].[5]

Plaintiff was seen in February and March 2006 at OU for problems ranging from stomach acid, nausea and vomiting to sinusitis. [R. 280 - 287]. He complained of dizziness on March 15, 2006 and March 31, 2006 and reported that discontinuing his blood pressure medicine had brought no improvement and that he planned to go to an eye doctor for glasses. [R. 280-283].

A vision test on May 10, 2006, revealed the presence of stereopsis (depth perception - 3 dimensional) but that glasses were needed due to presbyopia (age related diminished ability to focus on near objects). [R. 362-363].

---

[5] This log indicates Plaintiff received counseling but neither the counselor's treatment notes nor psychological or psychiatric examination reports are included in the record. Updated treatment plans from F&CS appear in the medical record at various intervals but there are no actual treatment notes in the record. It appears that any medications Plaintiff received for depression, anger or anxiety complaints were prescribed by the physicians at OU.

Plaintiff signed a new treatment plan at F&CS on July 4, 2006. [R. 228, 347, 201]. His GAF score that date was 60.[6]

The OU treatment records through January 2007 reflect that Plaintiff reported anxiety, hyperactivity and insomnia as well as occasional dizziness, which was thought to be related to one of his medications. [R. 262, 266, 278, 313-317, 322, 325, 334, 337].

On January 26, 2007, ALJ Lantz McClain found Plaintiff was capable of performing his past relevant work as a janitor and telemarketer and concluded Plaintiff was not eligible for Social Security benefits. [R. 18-24]. The Appeals Counsel denied review of the decision on June 18, 2007, which represented the Commissioner's final decision. 20 C.F.R. §§ 404.981, 416.1481.

Plaintiff applied for counseling and guidance at the State of Oklahoma Department of Rehabilitative Services for job training on January 29, 2007. [R. 359-361]. The record does not show that Plaintiff followed up on that application or that he ever received rehabilitative job training.

Plaintiff continued receiving treatment at OU for cold symptoms, nasal congestion, insomnia and followup for hypertension through June 2007. [R. 331, 328, 451-475]. During that time frame he complained intermittently of lightheadedness which the doctors attempted to control by decreasing the dosage of "B-Blockers" (antihypertensive medications) and substituting medications. [R. 328, 455, 461, 471].

---

[6] "The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.' American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) [DSM-IV-TR] at 32. A GAF score of 51-60 indicates moderate symptoms, such as a flat affect, or moderate difficulty in social or occupational functioning. American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000) (DSM-IV-TR).

On June 4, 2007, Plaintiff commenced treatment with Trudy J. Milner, D.O. [R. 513-515]. At that time, Plaintiff was taking Simvastatin (for cholesterol control), Hydrochlorothiazide (diuretic), Effexor (antidepressant), Cozaar (for hypertension), Atenolol (beta-blocker), and Ambien (sedative sleep aide). Plaintiff reported to Dr. Milner that he was diagnosed with heart palpitations from low potassium. *Id.* Examination revealed elevated blood pressure but regular heart rate and rhythm without murmur or abnormal sounds, gallops or rubs. Plaintiff was diagnosed with hypertension and his medications were renewed. *Id.*

On August 7, 2007, Plaintiff appealed the Commissioner's final decision to the Northern District of Oklahoma [07-CV-430-PJC].

Dr. Milner saw Plaintiff again on June 25, 2007, July 23, 2007, October 15, 2007, January 10, 2008, January 31, 2008, May 5, 2008 and June 30, 2008. [R. 492-510]. At the October 15, 2007 appointment, Plaintiff reported a therapist at Parkside had given him Seoquel and Triliptel but he did not like the way it made him feel. [R. 504]. On May 5, 2008, Plaintiff reported the Ambien was working well but asked if there was something that could help with his nerves and help him sleep. [R. 495]. After a discussion about all his medications, Plaintiff's prescriptions were continued at the same dose. [R. 497]. Conjunctivitis was assessed and Plaintiff was given a Neosporin Ophtalmic solution to use. [R. 495]. There were no complaints of dizziness or anger management difficulties recorded during this time period.

On September 17, 2008, Northern District of Oklahoma Magistrate Judge Cleary, proceeding by consent of the parties, held that the ALJ did not properly consider whether Plaintiff had any functional limitations due to dizziness and reversed and

9

remanded the decision to the Commissioner for further development in that regard. [R. 421-430].

Plaintiff returned to Dr. Milner on October 6, 2008, for medication review. [R. 488]. He was seen again on January 14, 2009 and February 13, 2009. [R. 482-488]. During those appointments, Plaintiff reported he exercises daily for more than 30 minutes and that he is physically active on a regular basis. *Id.* A side effect of medication reported was diarrhea. Diabetes was diagnosed in January 2009 and Plaintiff was prescribed Metformin. [R. 488]. No complaint of dizziness was recorded during any of these visits.

Plaintiff's eyesight was again tested on February 23, 2009. [R. 564-565]. Visual acuity in the right eye was measured at 20/20, uncorrected. Plaintiff reported difficulty focusing on up-close images and was diagnosed with hypermetropia (far-sightedness). *Id.*

On February 25, 2009, Dr. Milner treated Plaintiff for chest congestion, cough and diarrhea. [R. 479]. Plaintiff's medications were reviewed and he was encouraged to increase fluid intake. *Id.* No mention of dizziness was reported.

The record contains two copies of an Intake Assessment Form dated April 6, 2009, signed by Lila Blackburn, M.S., LPC, a licensed professional counselor. [R. 568-569, 571-572]. The intake assessment form contains Plaintiff's description of his "presenting issues" as follows:

> Ron reports /p hx of trauma + physical abuse by (F) - (M) died 4 yrs ago. Having flashbacks, ↓ mood +4, irritable/angry - yelling @ kids - ↑ stress 1-90SUDS - Guilt from /p, Isolating

10

[R. 568, 571]. Ms. Blackburn's clinical impression was PTSD - 309.81 / 300.02; GAD - Traumatic /p hx of physical abuse by (F). [R. 569, 572]. She assessed his GAF at 52. *Id.* Goals set for Plaintiff were to decrease PTSD flashbacks; increase mood; decrease stress and anger. *Id.*

The record contains two copies of one progress note by Ms. Blackburn. [R. 567, 570]. It is dated May 8, 2009, and marked as session two. *Id.* The note reflects Plaintiff reported he is too dizzy to work, that he was becoming confused easily, that he was having difficulty controlling anger or "rage" and was having difficulty with S.S. *Id.* Ms. Blackburn counseled Plaintiff on ways to process his emotions and to cope and she recommended Plaintiff get his medications re-evaluated by his doctor or psychiatrist. *Id.* Plaintiff was to call back to reschedule. *Id.*

At the hearing before ALJ McClain on May 11, 2009, Plaintiff testified that he lost his part-time job as a telemarketer and that he had a failed work attempt at a gas station as a cashier. [R. 577]. He claimed he was unable to do all his duties because of dizziness, visual problems and trouble focusing and concentrating. [R. 578-579]. He testified his doctors have adjusted his medication but that he is still having dizziness. Plaintiff said he was seeing Ms. Blackburn, a therapist, for post traumatic stress disorder which causes flashbacks, mood changes, anxiety, anger and sadness. [R. 585 - 590]. He testified the therapist thinks Dr. Milner was not prescribing the right medication and that he is still experiencing these symptoms. [R. 592].

## **The ALJ's Decision**

On September 25, 2009, ALJ McClain issued his written decision, the findings of which are the subject of this appeal. [R. 399-405].

11

The ALJ determined at step one that Plaintiff has not engaged in substantial gainful activity since January 30, 2003, his alleged onset date. [R. 401].

At step two, the ALJ found Plaintiff has severe impairments of loss of vision in the left eye, diabetes and high blood pressure controlled on medicine with occasional dizziness. *Id.* He noted Plaintiff's most recent vision tests and pointed out that the prior vision tests had shown a lesser visual acuity. The ALJ again found Plaintiff's adjustment disorder and mixed anxiety disorder are non-severe. [R. 401-402]. He noted Plaintiff's GAF score of 60 and referred to his previous decision for a discussion of the rating of severity in this instance.

At step three, the ALJ concluded Plaintiff's impairments do not meet the listings. [R. 402].

The ALJ assessed the following RFC for Plaintiff:

> ...to perform light work as follows: occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk at least 6 hours out of an 8 hour workday, sit at least 6 hours out of an 8 hour workday, avoid hazards such as height and open machinery, unable to read fine print, he has high blood pressure and resulting dizziness so he should not be required to lift heavy objects and should avoid such things as hazards, he does have some vision problem and so should not be required to read fine print as part of his job duties.

[R. 402]. The ALJ stated he was adopting the summary of the objective medical evidence set out in his prior decision but not the findings, conclusions or decision. [R. 402]. He then summarized the medical evidence, including evidence he had not mentioned in his earlier decision and the more recent medical evidence. [R. 403-404].

At step four, the ALJ cited the VE's testimony as support for his conclusion that Plaintiff could return to his past relevant work as a telemarketer and was therefore not disabled as defined by the Social Security Act. [R. 404].

**Discussion**

Step Four Findings

Plaintiff claims the ALJ's hypothetical to the vocational expert (VE) at the hearing did not contain all the impairments of record because it did not include limitations imposed by Plaintiff's mental impairments.

In the first written decision issued by the ALJ [R. 18-24] the ALJ explained that he had considered Plaintiff's anxiety-related disorder and found that "his psychological difficulties would be non-severe by Social Security standards." [R. 21]. The ALJ applied the "special technique" required by the regulations and determined Plaintiff had no restriction of activities of daily living; that he had mild difficulties in maintaining social functioning; that he had mild deficiencies of concentration, persistence or pace; and had no episodes of deterioration or decompensation of extended duration. [R. 21].

In his second decision, the ALJ again concluded that Plaintiff's adjustment disorder and mixed anxiety disorder do not affect Plaintiff's ability to perform work-related activities based upon Plaintiff's GAF score of 60 and he referred to his "previous decision for a discussion of the rating of the severity in this instance." [R. 401-402]. In addition, the ALJ addressed Ms. Blackburn's "opinion" and stated he had given it substantially reduced weight because she is not an acceptable source. [R. 403]. He also noted that the record contained very few references that Plaintiff had actively

sought treatment for his alleged mental impairments during the over-five-year period of time since Plaintiff's alleged onset date.

Plaintiff asserts that he suffers from more severe mental impairments than "merely an adjustment disorder with mixed anxiety" and that the RFC and hypothetical should have included the "effects" of PTSD in addition to depression. He also argues that because he was told to "avoid conflict at all costs" due to his anger, such a restriction should have been included in the RFC and hypothetical.

As pointed out by counsel for the Commissioner, however, Plaintiff failed to establish that his mental impairment caused functional limitations that significantly limit his ability to do basic work activities. Plaintiff points to his own descriptions of the "effects" of his symptoms on the intake notes and treatment plans for F&CS and Ms. Blackburn and cites his own testimony at the hearing as evidence supporting his claim that his mental impairment is severe. The single notation in the medical record cited by Plaintiff was a recommendation to avoid conflict, when Plaintiff reported having been in a fight, by Plaintiff's primary care physician who was monitoring Plaintiff's high blood pressure. [R. 301-303]. While the medical records do contain the PTSD diagnosis, there are no treatment records, notations or clinical findings that reflect Plaintiff's ability to perform gainful work activity was limited because of any mental impairment. The mere presence of a condition--without any demonstrable work-related impact--will not support a disability claim. *See Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir.1997) (following *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)); see also 20 C.F.R. § 404.1521.

The claimant bears the burden of proving a disability within the meaning of the Social Security Act. 42 U.S.C. § 423(d)(5); *Howard v. Barnhart*, 379 F.3d 945, 948 (10th

Cir. 2004) ("We disagree with claimant's implicit argument that the agency, not the claimant, has the burden to provide evidence of claimant's functional limitations."); *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 2004) (stating that a diagnosis does not "automatically mean" that a claimant is disabled.). Plaintiff failed to establish the existence of a mental impairment that significantly limits his ability to perform basic work activities. *See Bowen v. Yuckert*, 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987) (step two designed to identify "at an early stage" claimants with such slight impairments they would be unlikely to be found disabled even if age, education, and experience were considered). "[T]he claimant must make a threshold showing that his medically determinable impairment or combination of impairments significantly limits his ability to do basic work activities...." *Id.* at 751.

Contrary to Plaintiff's argument, the ALJ did not find Plaintiff had moderate limitations in any of the four functional areas.[7] Because the ALJ properly found Plaintiff had no functional limitations associated with a severe mental impairment, his RFC and hypothetical to the VE properly reflected no such limitations.

Regarding Plaintiff's physical complaints, in his second decision, the ALJ specifically addressed Plaintiff's complaints of intermittent dizziness and included the resultant limitation in the RFC. At the hearing, the ALJ presented the VE with a hypothetical that included the necessity to avoid hazards such as heights and open

---

[7] Plaintiff cites *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) which is distinguishable from this case because in *Haga*, the ALJ found the claimant had "moderate" limitations in the PRT and then failed to assess any associated limitations in the RFC. In this case, the ALJ found only mild difficulties in social functioning and in concentration, persistence or pace and concluded that those difficulties would not significantly affect Plaintiff's ability to engage in work-related activities. [R. 21, 403-404].

machinery to accommodate that limitation. [R. 595-596]. Plaintiff "analogizes the symptoms of dizziness and lightheadedness to seizure activity" and argues that his "dizziness should be covered more than a mere restriction from heights and moving machinery." [Dkt. 15, p. 3]. However, no suggestion of seizure activity appears in Plaintiff's treatment records and Plaintiff has not identified what "more" restrictions the ALJ should have included in his hypothetical. The Court finds no basis for reversal on the grounds asserted by Plaintiff in his briefs.

## Consideration of the Medical Evidence

Plaintiff complains that the ALJ committed reversible error because he "failed to consider all of the opinion evidence of the varying GAF scores and improperly weighed them, he found [Plaintiff] did not have enough mental health treatment without explaining how much is required, and he did an improper evaluation of [Plaintiff's] 'other source' opinion." [Dkt. 15, pp. 5-7].

As noted by counsel for the Commissioner, the GAF scores in the medical records ranged between 52 and 60. [Dkt. 16, pp. 6-7]. A score of 51-60 indicates moderate symptoms. DSM-IV-TR, at 32. The ALJ noted Plaintiff's GAF score of 60 when he presented to F&CS for a Therapy Agreement Plan in July 2006. [Dkt. 21, 201, 401]. There is no indication in the record that Plaintiff's GAF was ever scored below 52. There was no need for the ALJ to mention each and every GAF score in the medical record. Moreover, the GAF is not an absolute determiner of ability to work. *See Howard v. Comm'r of Soc.Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy). The Court finds no error on the part of the ALJ in this regard.

During his analysis of Plaintiff's credibility, the ALJ noted that Plaintiff was noncompliant with his treatment by failing to appear for appointments. [R. 403-404]. He did not determine Plaintiff's mental impairments were non-severe because he "did not go for mental therapy enough" as asserted by Plaintiff's counsel. [Dkt. 15, p. 6]. Rather, the ALJ considered Plaintiff's failure to keep his counseling appointments as evidence that is inconsistent with his claim that he actively sought treatment for a severe mental impairment. [R. 403-404].

Included in Plaintiff's subjective complaints to his primary care physician on October 15, 2007, is the following note: "He states he was talking to therapist at Parkside for depression that he was taking." [R. 504]. Plaintiff now contends that this note was evidence that Plaintiff was a patient at Parkside mental health clinic and that the ALJ was required to address it as such. [Dkt. 15, p. 6]. Plaintiff did not list Parkside as a source of medical treatment in his application materials. [R. 65-71]. Plaintiff's counsel did not provide the ALJ with any records from Parkside and he advised the ALJ at the hearing that the record was complete. [R. 576]. When asked about treatment for his "mental situation" Plaintiff testified he had been attending F&CS and seeing a therapist (Ms. Blackburn) but he did not mention Parkside. [R. 585-591]. The Court finds no merit to Plaintiff's complaint that the ALJ improperly "ignored" evidence because he did not acknowledge that Plaintiff was treated at Parkside.

In his decision, the ALJ said he considered the evidence from Ms. Blackburn and that he gave it "reduced weight." [R. 403-404]. The ALJ explained that Ms. Blackburn is not an "acceptable" medical source and he noted that the objective medical evidence showed very few references [for mental health treatment] over a more

17

than five year period of time. *Id.* The ALJ was required to consider the evidence from Plaintiff's therapist, which he did. *See* 20 C.F.R. § 416.913(d)(1) ("[W]e may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work."). *See also Frantz v. Astrue*, 509 F.3d 1299, 1300-01 (10th Cir. 2007) (ALJ required to discuss "other source" opinion evidence and to describe the weight he gave that evidence).

Ms. Blackburn's one-page, second session treatment note did not offer an opinion regarding Plaintiff's abilities to perform work activities. [R. 567, 570]. Ms. Blackburn outlined Plaintiff's comments concerning his progress toward the goals they had set in the first session when the Intake Assessment Form was prepared, the intervention techniques applied and her observation regarding Plaintiff's strengths and limitations in achieving those goals which she described as "Negative thoughts - lack of motivation, poor self esteem. Discussed finding ways to help others to ↑ mood." *Id.* Though the ALJ's explanation regarding the reasons he accorded little weight to the evidence from Ms. Blackman was imperfect, the Court finds the ALJ's reasoning was adequately expressed in this instance.

Given the remainder of the medical evidence indicating that Plaintiff appeared for counseling only four out of at least 14 scheduled appointments at F&CS and that he failed to follow up with a social worker as recommended by his primary care physician, the ALJ's conclusion that Plaintiff's mental impairment was not severe during the five years between the filing of his application and the ALJ's second decision was reasonable. The Court finds no merit to Plaintiff's contention that the ALJ failed to properly consider the medical evidence in the record.

Credibility Determination

Plaintiff complains that the ALJ did not discuss any of his testimony. [Dkt. 15, p. 8]. He claims the ALJ ignored the consistency of [his] own statements and asserts that the testimony "appears to track well with the complaints to his doctors." *Id.* A fair reading of the ALJ's decision reveals that the ALJ considered Plaintiff's testimony and weighed it against the medical evidence. The ALJ explained that Plaintiff's most recent vision test results are inconsistent with Plaintiff's complaints about visual difficulties and he also noted the infrequency of complaints of high blood pressure to medical care providers. [R. 404]. As Plaintiff acknowledges in subsequent argument in his briefs, the ALJ also mentioned Plaintiff's claims of side effects from medications, indicating he considered Plaintiff's testimony in that regard.

Plaintiff's interpretation of the February 23, 2009 visual acuity report is incorrect. [Dkt. 15, pp. 8-9]. OD (oculus dexter) refers to the right eye. OS (oculus sinister) is the left eye. OU (oculi uterque) means both eyes. The acuity measurements in the report were attributed to Plaintiff's right eye. [R. 564-565].

The ALJ found that Plaintiff's credibility was substantially diminished based upon his review of the medical evidence. *See Brown v. Bowen*, 801 F.2d 361, 362-63 (10th Cir.1986); *Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir.1983) (Subjective complaints of pain must be evaluated in light of plaintiff's credibility and the medical evidence.). The ALJ reasonably concluded based on the medical evidence presented that Plaintiff was capable of working despite his assertions to the contrary. After review of the record and the ALJ's decision, the Court concludes that the ALJ's credibility assessment was adequately linked to substantial evidence in the record and met the

requirements set forth in *Kepler v. Chater*, 68 F.3d 387, 390-91 (10th Cir.1995). Additionally, "[c]redibility determinations are peculiarly the province of the finder of fact, and the Court will not upset such determinations when supported by substantial evidence." *Kepler,* 68 F.3d at 391 (quotation omitted). *Kepler* "does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *White,* 287 F.3d at 909 (quoting *Qualls,* 206 F.3d 1368 at 1372). To the extent that Plaintiff invites the Court to reweigh the evidence, the Court declines. *Id.,* (courts are unable to reweigh the evidence and substitute their judgment for the ALJ's).

## Conclusion

The ALJ's decision demonstrates that he considered all of the medical reports and other evidence in the record in his determination that Plaintiff retained the capacity to perform his past relevant work. The record as a whole contains substantial evidence to support the determination of the ALJ that Plaintiff is not disabled. Accordingly, the decision of the Commissioner finding Plaintiff not disabled is AFFIRMED.

SO ORDERED this 26th day of April, 2011.

*Frank H. McCarthy*
FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE

20